Elizabeth Lucille CULVER, Executrix of the Estate of George L. Culver, Deceased,

Appellant (Defendant below),

v.

Constance S. SEKULICH, Administratrix of the Estate of Stephen E. Sekulich, Deceased, Appellee

(Plaintiff below).

No. 2887.

Supreme Court of Wyoming.

Sept. 15, 1959.

344 Pac.2d 146

440

Murane & Bostwick, Edward E. Murane, Casper, for appellant.

Greenwood, Ferrall & Bloomfield, Cheyenne, Rogers, Field, Gentry & Jackson, Clay C. Rogers, Kansas City, Mo., and Burbridge & Burbridge, Omaha, Neb., for appellee.

Before BLUME, C. J., and PARKER and HARNS-BERGER, JJ.

444

## OPINION

Mr. Justice PARKER delivered the opinion of the court.

On October 29, 1956, Stephen E. Sekulich was a passenger in a Beechcraft, twin engine, Bonanza airplane piloted by George L. Culver. That morning the two went from Newcastle, Wyoming (their place of residence), to Billings, Montana, and in the afternoon left for the trip home sometime near two o'clock. About 3:45 p. m. the plane crashed in a ranching area of Niobrara County, killing both men.

The present action was brought by Constance S. Sekulich, the widow of the passenger and administratrix of his estate, against Elizabeth Lucille Culver, the widow of the pilot and executrix of his estate, the petition alleging that the plane was under the exclusive control of Culver and was negligently caused to crash

to the ground, killing Sekulich. The allegations of negligence were numerous and included the pilot's starting the flight from Billings when he knew or should have known that a snowstorm existed in his route which would make the trip extremely dangerous; his failure to use alternate available landing fields; his failure to maintain a safe altitude or to operate the plane in accordance with instrument flight rules; his operation of the aircraft at low altitudes in clouds and snow showers, particularly in the light of his defective vision; and the violation of various Civil Air Regulations. The answer, admitting the status of the parties, denied other alleged matters and set up two affirmative defenses: that the plane encountered weather elements which caused it to crash to the ground, such action of the elements being an act of God and not due to the negligence of the pilot; and that the pilot and passenger were on a joint venture so that the negligence of the pilot, if any, must be imputed to the passenger.[1]

On the trial of the cause before the court without a jury, a judgment was entered for plaintiff in the sum of $65,544.82. Defendant has appealed, urging error of the trial court in (1) permitting various experts to testify and give opinions based upon hypothetical questions which were not supported by any evidence in the record, (2) making findings of fact which were definitely and specifically based upon the opinions of the experts, which opinions were not supported by any evidence in the record, and (3) in issuing con-

---

[1] The question of the joint venture was not raised in the appeal.

clusions of law which being without foundation in the evidence and based upon improper findings of fact were erroneous and incorrect.

# I

## The Hypothetical Questions

Counsel for defendant cite the case of Peterson v. McMicken, 72 Wyo. 444, 266 P.2d 238, for the principle that the scope and conduct of hypothetical examination is a matter of judicial discretion; and they cite Miracle v. Barker, 59 Wyo. 92, 136 P.2d 678, as holding that the ultimate weight to be given to the testimony of experts is to be determined by the jury (or court) and there is no rule which requires them to surrender their judgment or give controlling influence to the opinions of scientific witnesses. Thus, defendant proceeds upon the theory that the scope and conduct of examination by means of hypothetical questions in the trial of a cause is a matter within the discretion of the court; that a hypothetical question may be framed so as to put any theory which may be deduced from the evidence; and that a question may assume any facts within the limits of the evidence upon which an opinion of an expert may be desired and may omit any facts not deemed by the questioner to be material to his inquiry, provided always that the question is based upon evidence which has been presented to the court. Plaintiff agrees with this view and cites Johnson v. Hanover Fire Ins. Co., 59 Wyo. 120, 137 P.2d 615, and Phifer v. Baker, 34 Wyo. 415, 244 P. 637. The authorities of both litigants are within the rule stated in 2 Jones on Evidence, 5 ed., § 415.

"* * * the [hypothetical] question should be framed so that it fairly and clearly states the as-

sumed facts which, according to the claim of interrogating counsel, have been proved, and for which there is some support in the evidence, and calls for an opinion of the witness which is based thereon."

Defendant contends that "in practically every hypothetical question there was an improper assumption of evidence and that the question was not based upon the evidence in the record."

The principle upon which the first point in the appeal is to be resolved is then by mutual agreement entirely clear, i. e., those hypothetical questions which were grounded upon evidence were proper; those for which there was no evidentiary foundation were improper.[2] Accordingly, we turn to defendant's criticisms of the hypothetical questions. She first complains of a hypothetical question preparatory to the requesting of the opinion of witness Nelson, Director of Aeronautics of the State of Wyoming:

"* * * on the afternoon of October the 29th, 1956 at approximately 3:00 o'clock in the afternoon or perhaps 3:10 or 3:15, that is the approximate time, the airplane in question was observed —was heard flying in the Lance Creek Valley going east and a little north near the Rumney residence and in approximately 15 minutes later

---

[2] Notwithstanding the apparent agreement of counsel in the present case, jurists and legal writers have long been plagued by the difficulties which the hypothetical question presents, not the least of which is the formulation of the bases for the interrogation. See McCormick on Evidence, 1954, §§ 14, 16; 23 Tex. L. Rev. 109, 122-126; 2 Wigmore on Evidence, 3 ed., §§ 682-686; Judge Learned Hand, New York Bar Association Lectures on Legal Topics, 1921-1922.

it was seen going in—it was observed going in the opposite direction. Assume that near that time it was observed near the Spencer Ranch, which is approximately 3 miles from the Rumney Ranch and in the same valley and that at the Spencer Ranch it was observed twice. The first occasion it was going in one direction and on the next occasion it was going in the opposite direction and at the time it was observed at the Spencer Ranch it was approximately 2 yards above a bank, which is approximately 40 feet high. And assume that about one minute before the crash it was seen at the Rumney Ranch at a height of about 75 feet and traveling in the direction in which the crash occurred. And assuming that during that time, covering approximately 30 minutes before the crash when the airplane was heard and observed as stated, it was snowing heavily. * * *"

Defendant argues that there is no evidence to show that the plane which was seen by the various witnesses was the Culver plane.

Gladys Rumney said she saw a light colored plane which made a good deal more noise than her husband's one-motor plane go over about three-thirty and about fifteen minutes later she heard it again, walked to the door, and heard the plane hit the ground. Her son, Raymond Rumney, went to the wreck shortly thereafter; and his father, James E. Rumney, went there about seven o'clock that evening and helped to carry out the bodies of Culver and Sekulich. This evidence, uncontradicted, establishes without question that the plane which Mrs. Rumney last heard was the one piloted by Culver. It is not so clear that the plane observed some fifteen minutes or more before the crash was the same one. William Spencer said, "Whether it was the same plane or not, it went over twice in the course of the afternoon," and later said, "it sounded

like a two motor plane," implying that the sound was the same in each instance. Sylvia Hammell was asked, "On each and every time that you heard the plane, did you hear any difference in the working or sound of the motor?" and she answered, "No." Although this evidence was not specific, it was unrefuted, and we think it was substantial in the light of the improbability that two different twin-motor planes would be traveling over a ranching area at a low altitude during a snowstorm within such a short space of time.

Defendant contends that there was nothing in the record showing the height of the bank over which the plane flew immediately prior to the crash. The testimony does not say, as does the hypothetical question to Nelson, that the bank was forty feet high, at least in so many words. Josephine Spencer said she thought the bank was higher than her two-story house, the height of which she did not estimate. Defendant says the point is material because it tended to show the prudence or imprudence of the pilot's flying the plane at a height of forty feet above the ground. Even if this assumption is warranted, which we doubt, it is no more detrimental to defendant on this point than the unquestioned evidence of Sylvia Hammell who said that she saw the plane flying "just barely above the tops of the trees" which she said were probably twenty-five to thirty feet high. Thus, the statement in the question of the height of the bank does not seem to have prejudiced defendant.

Defendant urges, and we think with merit, that there is nothing in the record to substantiate the statement that "about one minute before the crash, it [the plane] was seen at the Rumney Ranch at a height of about 75 feet." No witness testified to this effect. Gladys Rumney, the only person mentioning the height

of the plane as seventy-five feet, said that she had seen it at that height some 600 feet away going east and a little north, that fifteen minutes later she *heard* a plane which sounded as if it were flying north and slightly to the west, and that immediately thereafter she heard the crash. Sylvia Hammell said she heard the plane, then saw it, and some ten to fifteen minutes later heard it immediately prior to learning of the crash. As above mentioned, she said the height of the plane was "just barely above the tops of the trees." The only other witness mentioning height was Bertha Ann Potter, seven years old at the time of the crash and nine years old at the time of the trial, who alluded only to the plane's being two yards above the bank as it passed over. Bertha Ann's mother, Josephine Spencer, said she received word of the crash shortly after her daughter had called attention to the plane. The scene of the crash was approximately three miles from the Spencer residence and considering the speed of the aircraft, the crash, according to the evidence, could have occurred approximately one minute following the time Bertha Ann saw the plane. It is clear, therefore, that the statement in the hypothetical question that the plane was seventy-five feet high about one minute before the crash was not supported by the evidence, at least not literally. Courts have not always been in agreement as to the rejection or acceptance of a hypothetical question where there has been a minor variance in the facts upon which it purports to be based. See 23 Mich.L.Rev. 411. 2 Jones on Evidence, 5 ed., § 416, p. 784, after stating this general principle, says:

"But a question is not necessarily to be rejected by the court although * * * the question does not state the facts as they actually exist. * * * it is sufficient if the question fairly states such facts as the proof of the examiner fairly tends to establish, and fairly presents his claim or theory. * * *"

2 Wigmore on Evidence, 3 ed., § 680, states:

> "If the Premises fail, the Conclusion must be disregarded. * * * *But the failure which justifies rejection must be a failure in some one or more important data,* not merely in a trifling respect." (Emphasis supplied.)

The force of the challenged statement in this part of the question to Nelson seems to be that the plane was flying at a low altitude a short time before the crash, and the evidence clearly sustains this even though it does not bear out the exact footage at that time.

It is complained that there is no evidence to support the statement that the Culver plane was in the area for approximately thirty minutes, and it is pointed out that the maximum time given by any witness was twenty-five minutes and that the difference of five minutes is fatal when a plane is traveling at the rate of 200 m. p. h. or $3\frac{1}{3}$ m. p. m. The factual basis of hypothetical questions must be accurately stated, but we doubt if the variance mentioned here should vitiate this question, especially when none of the witnesses purported to be accurately accounting for time by the aid of watches or clocks and when throughout the trial and in the questioning the word "approximately" was used.

From what we have said, we think we have made it clear that in our view the hypothetical question here set forth the theory of the plaintiff and in general the facts which the evidence tended to prove, so that any failure to adhere literally to the evidence is not fatal.

Defendant challenges another hypothetical question to witness Nelson:

"Q. Mr. Nelson, in your judgment and opinion, would it be the exercise of prudence for a pilot flying an airplane equipped to be flown according to instrument flight rules to fly that airplane under visual flight rules in a snow storm where the visibility was limited to a distance of from one fourth to three fourths of a mile in the valley of the Lance River, in the area of the crash, for a period of time approximately 25 to 35 minutes at an altitude of from 40 to 75 feet in trying to find a place to effect a landing?"

The objection here is twofold: that there was no evidence in the record to show that the plane was being flown about in that area for a period of twenty-five to thirty-five minutes or, even if it was, that the height during that time was from forty to seventy-five feet. Although the evidence is susceptible of defendant's interpretation, it is not for a party to foreclose views which differ from his own. The record is devoid of any official statement of the Billings airport authorities as to the time of the Culver plane's take-off. If the trial court was obligated to accept as the time of take-off the testimony of witness Seeley who said that he *learned* it had occurred at 2:17 p.m., Culver could not have been in the area where the witnesses were for a period of twenty-five to thirty-five minutes. On the other hand, however, witness Hartwig said he saw the two men *depart* before two o'clock, and he gave as his reason for fixing the time the fact that he was back in his office at two o'clock for an appointment, and the further fact that at ten minutes after two that day his daughter, Mrs. Sekulich called and he told her the two men had been out twenty or twenty-five minutes. If Hartwig's testimony was interpreted literally as the time of departure and if the plane traveled at the maximum ground speed of 200 m. p. h., the distance of approximately 260 to 270 air miles between

Billings and the scene of the wreck might have been covered by approximately 3:10 p. m. We doubt if the framer of a hypothetical question should be required as a predicate to prove what was happening at every instant of a period, and we think that it may be assumed that what was proved as having occurred at certain times in the period covered by the question may be taken as true for the entire period unless the contrary be shown. As we have previously indicated, one witness said she saw the plane flying just above the tree tops and another said she saw it at seventy-five feet (basing the height of the plane on the fact that she believed it to be twice as high as their thirty-five to forty foot trees). The witness Potter said the plane was about two yards above the bank when it went over, the height of the bank not having been directly specified by anybody. The trial court was entitled to exercise its discretion as to the hypothetical questions propounded, and in this instance there was no abuse of the discretion.

Defendant objected to the hypothetical question to witness Peck, U. S. Air Force pilot:

"* * * assuming that the pilot of this plane did not turn around and go back in the direction which he had been flying to escape the storm but continued into it, then tell us, what in your opinion, based upon your knowledge of Civil Aeronautics Rules and the standard and practice and custom of pilots, he should have done?"

The basis of this objection was that there was no evidence to show that the pilot continued into the storm or that he should have turned around, he being authorized to fly on instrument flight. It is not essential that every possible fact relating to a circumstance be stated in a hypothetical question. Crosby v. Portland Ry. Co.,

53 Or. 496, 511, 100 P. 300, 101 P. 204; 2 Wigmore on Evidence, 3 ed., § 682. If the adverse party wishes additional facts laid before the witness, he is free to do so on cross-examination.[3] Cobb v. Spokane, P. & S. Ry. Co., 150 Or. 226, 44 P.2d 731. Whether the pilot Culver was continuing into the storm or trying to fly around it was a matter to be determined by the trier of fact. We think that either party in his questioning might have made such assumptions as he reasonably believed to be warranted by the evidence. The same rule applies to the pilot's authorization (if it actually existed) to proceed on instrument flight.

Defendant objects to several hypothetical questions to witness Lynch, a pilot and flight instructor:

"Now, do you have an opinion as to whether or not it would be prudent and would be in accordance with Civil Aeronautics Rules and the standard of procedure followed by air pilots for the pilot to continue into the snow storm with a visibility of one fourth to three fourths of a mile for a distance of 30 to 40 air miles before going onto instrument flight?"

"Mr. Lynch, assuming that on October 29, 1956, and at about and between 3:25 p. m. until about 3:45 p. m., Mr. Culver's airplane was seen flying in the Lance Creek Valley * * * it was seen flying in a northwesterly direction just immediately before 3:45 p. m. * * * It was flying at an altitude of from 40 to 75 feet from the ground. Now, assuming those facts, will you please tell us whether or not you have an opinion as to whether or not that plane has been flown by the pilot in accordance with standard practices and customs of air

---

[3] This principle was the subject of comment by the court during the course of the trial.

pilots and in accordance with Civil Aeronautic Rules and Regulations and in the exercise of reasonable prudence. * * *"

"Now Mr. Lynch, assuming that a pilot flies into conditions such as I have described and is flying at the altitude at from 40 to 75 feet in the snow storm—the altitude of 40 to 75 feet from the terrain there, and is flying in a snow storm where the visibility is only one fourth to three fourths of a mile, do you have an opinion as to what he should do with the airplane?"

Here defendant again urges that there was no evidence to identify the plane and no evidence that it was flown about the area for the period of time mentioned or at the height stated. Additionally, she says that there was no evidence to show that the plane flew into the snowstorm with a visibility of one-fourth to three-fourths of a mile for a distance of thirty to forty miles or that the plane went on instrumnet flight. We have already discussed our views as to the identity of the plane, the period during which the testimony showed it to have been in the area, and the height of the flight at various points. As to the effect of the storm on the vision, both William and Josephine Spencer said visibility was about 300 yards and later set it at a quarter of a mile. Witness Hammell said that she could see approximately a quarter of a mile. Gladys Rumney said that she thought she could see through the snowstorm between one-half and three-fourths of a mile. Witness Seeley who outlined the area of the storm as of five o'clock on the evening of October 29, 1956, said that the storm was moving from southeast to northwest at the rate of about 15 m. p. h.; that the visibility in Newcastle between 12:45 and 1 p. m. was one to two miles; that he flew to Upton, taking fifteen to seventeen minutes, stayed there approxi-

mately two minutes, attemped to return to Newcastle, and after eighteen miles was forced down at Osage because of the limited visibility in Newcastle; and that he returned by motor vehicle the remaining four miles to the Newcastle airport where he found the visibility from then until he departed at four o'clock to vary from one-fourth to one and a half miles. Although the record does not show that the limited visibility assumed by the question and fully warranted by the testimony extended for thirty or forty air miles, the uncontroverted statements of the limitation in vision in some of the areas under consideration was certainly a strong enough circumstance to justify the assumption that a person could not see a greater distance over any of the territory which the plane covered during that period.

Defendant says that there was no evidence in the record to show that Culver went onto instrument flight,[4] but she fails to argue the matter or attempt to show that the lack of evidence would vitiate the question. It is therefore unnecessary that we consider this point more than to say that the unexplained phrase "before going onto instrument flight" does not necessarily connote the change in the type of flight which defendant assumes.

Considering the hypothetical questions to Lynch in the light of the record, we see no impropriety in the trial court's having allowed them to stand.

Defendant urges that it was error for plaintiff to ask witness Seeley whether there was a standard prac-

---

[4] *Instrument flight* is flight solely by reference to instruments within the airplane as opposed to *visual flight*, flight by reference to things outside the airplane.

tice as to the filling of the tanks of a plane with gasoline before departure. No argument is presented that the asking of the question prejudiced the defendant, but it is merely said that the question is outside the pleadings and the issues. We think the objection well taken and that the question could have had no bearing on the issues presented, but the adverse ruling was not prejudicial to the party appealing.

Defendant's arguments against the propriety of the questions submitted to the expert witnesses lose considerable force when we perceive throughout the discussion the attitude which is stated in words at one point, "All of the hypothetical questions propounded to the various experts were based on false and exaggerated testimony." Actually, defendant seems not to be challenging the existence of evidence upon which the hypothetical questions could be based but rather the dependability of the testimony given.

From our analysis of the record, it appears to us that there was some evidence to support every hypothetical question to which objection was made. Such evidence was not always complete, was sometimes hazy as to time, distance, and other vital points but in general furnished a fair climate for the consideration of the views of the expert witnesses. Whatever omissions there were might well have been cured by the calling to the attention of the experts on cross-examination the situations which the defendant thought were unspecified or unclear. In any event, the credibility of the witnesses and the weight of the testimony were matters within the exclusive province of the trial court.

## II

## Findings of Fact

Most of the claimed errors in the trial court's findings emanate from the alleged impropriety of hypothetical questions, and since we hold that such questions were justified, it is unnecessary to discuss at length the findings of fact.

It is said that there is no basis for the finding that Sekulich at all times exercised ordinary and reasonable care for his own safety. We agree with the defendant that there was no proof of the passenger's being careful, but neither was there any proof of his being negligent, and under such circumstances the legal presumption is that he was alert to the preservation of his own life and well-being. Wilhelm v. Cukr, 68 Wyo. 1, 227 P.2d 988, 230 P.2d 507.

Counsel urge the finding that the crash was 293 miles from the airport at Billings was without support in the testimony. It is true that uncontradicted evidence showed the air miles *direct* from Billings to the crash to be between 260 and 270 miles, but there is other evidence to show the distance from the Billings airport to the Newcastle airport as approximately 253 miles and the distance from there to the crash as approximately 40 miles, totaling the 293 miles somewhat ambiguously found by the court.

Defendant argues that there is lack of support in the record for the finding that the flight commenced at the Billings airport at approximately between 1:50 p. m. and 2:17 p. m. and terminated at 3:45 p. m., and that the pilot was operating under visual flight con-

ditions and circumstances. We have heretofore sufficiently discussed the evidence relating to the first portion of this objection. As to the second portion the record lacks direct evidence to show whether the pilot was flying by instrument or visually and is silent as to the filing of a flight plan before take-off as would have been essential under instrument flight rules.[5] Counsel present no argument as to the allowable presumption under such a situation, but we think that the testimony tending to show flight back and forth in the snow at extremely low altitudes warranted the finding.

The court found that Culver could in the exercise of reasonable prudence and ordinary care have flown the airplane to the alternate Wyoming airports of Sheridan, Douglas, Casper, Crazy Woman and Rock Springs, to Billings, Montana, or Chadron, Nebraska. Defendant says there is nothing in the record to show that Culver could or should have flown to Crazy Woman, Rock Springs, or Chadron. Although no witness gave specific reasons why the pilot could have availed himself of one of these three places, these airports with the others mentioned are shown on Exhibit 24a as airports in Wyoming, western Nebraska, and southern Montana. The fact that they were recognized by aeronautic authorities and the further fact that they were outside the territory testified by witness Seeley as being the storm area undoubtedly warranted the court in finding that the pilot could have in the exercise of reasonable prudence and ordinary care utilized one of them.

---

[5] § 60.41, Civil Air Regulations, as amended to September 10, 1956.

Defendant objects to the findings:

"Said George L. Culver failed to exercise reasonable and ordinary care in flying and piloting said plane at and near the scene of the crash over sparsely settled areas, near and about several livestock ranches, houses, barns, fields, and trees in said snow storm at altitudes from 40 to 75 feet at a speed of approximately 180 miles per hour; and when and while in flight, visibility was less than one mile, and when he knew, or in the exercise of reasonable care, should have known that hills and bluffs project from the ground and in the exercise of ordinary care, he could have and should have, elevated or increased the altitude of said plane so as to fly it with reasonable safety above the obstructions and particularly the obstruction into which he crashed."

She says that there was no competent testimony to support this finding, but that on the contrary the pilot had two alternatives, (1) to effect a forced landing, or (2), to go on instrument flight and gain altitude. She urges further that the trial court overlooked testimony of various witnesses of two different landing strips in the area and of the fact that the pilot Culver had flown along a pipeline in that valley on different occasions. As we have previously indicated, we think there was sufficient evidence to justify the court in finding that the flight occurred from altitudes of from forty to seventy-five feet at a speed approximating 180 m. p. h. when the visibility was less than one mile. We come then to the question of whether or not the court was justified in finding that the pilot did not exercise reasonable care in failing to increase the altitude of the plane so as to fly with safety above the obstructions. This was only one aspect of the pilot's behavior which the court was obligated to consider. Elsewhere the court had found the pilot "should have

reversed the course of said airplane and avoided entering said storm area," and that he could have in the exercise of reasonable care flown to various alternate airports. The finding under instant consideration deals with the last aspect of the care required of the pilot, he having been found to have failed in the exercise of reasonable care in two other decisions. There is no indication in this finding that the court failed to consider the feasibility of an emergency landing. Evidence had been submitted on both the potential and the danger of doing this, and we must assume that the court rejected this possibility after due consideration. We think it was within the trial court's province and warranted by the evidence.

There is also complaint that the court found the plane not to have been iced over at the time of the crash but to have been in good order and functioning properly. Various witnesses who were at the scene of the crash were interrogated as to ice and indicated that they saw none. The evidence of the witnesses who saw and heard the plane shortly before the crash spoke of the noise as being that of a two-motor plane, thereby indicating that the engines were not missing, and witness Nelson said, "I am certain that the aircraft flew into the ground with both engines operating." Although the evidence on the lack of icing and upon the plane's functioning properly is not overwhelming, it is substantial.

Defendant objects to the court's finding that:

"George L. Culver did not intend to and did not in the crash commit suicide or engage in a suicidal act. His death was directly caused by his negligence and lack of care as stated in these findings."

The objection is twofold, protesting both the finding of negligence as the cause of death and the finding of the pilot's lack of intention to commit suicide. The challenge to the finding of negligence adverts to the hypothetical questions which we have heretofore discussed. Although there was no direct evidence as to the intention, a finding that the death resulted from negligence is inconsistent with and negatives suicide.

There is complaint that the computation of the court in the findings and judgment is not consistent with the finding made in open court, but defendant does not show herself to be prejudiced or cite authorities on the point.

It is objected that the court has made no findings upon the allegations contained in paragraph seven of plaintiff's amended petition which relates to various portions of rules of Civil Air Regulations. Although no reason for the objection is stated, it is notable that the trial court in this case was warranted in making and did make other findings sufficient to support the judgment. Several of these were based upon violation of common law rules rather than of statutes but it is well recognized that the duty of exercising care to protect another person against injury may either have existed at common law or be imposed by statute. 38 Am.Ju.Negligence § 14. Where a finding of a certain fact necessarily controls the judgment, the omission of the court to find on other issues does not constitute reversible error. 53 Am.Jur. Trial § 1134.

### III

### Conclusions of Law

The arguments that the trial court's conclusions of law are improper grow out of the claim that the find-

ings of fact were incorrect and lead us only into further arguments on matters already considered. In the main, it is urged repeatedly under the authority of Miracle v. Barker, 59 Wyo. 92, 136 P.2d 678, that the trier of fact is not required to surrender its judgment on the hypothetical question and give controlling influence to the opinion of a scientific witness.[6] In supporting her theory, defendant highlights the discrepancies and inconsistencies of testimony with the repeated statement that the witnesses were inexperienced, inaccurate, and incorrect. This we do not think is within the province of counsel to determine nor is it for us to review at this time. The evidence presented to the trial court was as we view it susceptible of an interpretation given it by the trier of fact. It is the function of an appellate court to ascertain whether or not there was substantial evidence upon which the trier of fact could base its opinion if it believed the testimony. It is not for us to evaluate the evidence that was presented.

We find no error in the record which justifies reversal, and the case is accordingly affirmed.

Affirmed.

---

[6] We do not consider that the Miracle case establishes the limits within which the trier of fact is circumscribed, but merely provides the governing philosophy.