**FORD MOTOR CO., Appellant (Defendant below),**
**Loren Simpson and Stockmen's Motor Co. (Defendants below),**

v.

**John H. KUHBACHER, Appellee (Plaintiff below).**

**No. 4257.**

Supreme Court of Wyoming.

Feb. 19, 1974.

Reduced Judgment Accepted March 12, 1974.

---

1. Wallace v. Casper Adjustment Service, Wyo., 500 P.2d 72, 73.

Guy, Williams & White and Ward A. White, Cheyenne, for appellant.

Melvin M. Fillerup of Fillerup & Rohrbach, Cody, and John J. Cavan of Sandall, Moses & Cavan, Billings, Mont., for appellee.

Before PARKER, C. J., and McEWAN, GUTHRIE, McINTYRE and McCLINTOCK, JJ.

Mr. Chief Justice PARKER delivered the opinion of the court.

This is an appeal from a judgment in favor of plaintiff, John H. Kuhbacher, a minor who was injured while a passenger in an automobile manufactured by the appellee-defendant, hereinafter referred to as defendant. The suit was originally commenced against the Ford Motor Company, the Stockmen's Motor Company, which sold the automobile; and Loren Simpson, the driver of the car on the early morning of July 5, 1967, when the accident occurred. Prior to the trial the plaintiff entered into a covenant not to sue Simpson and Stockmen's in consideration of $10,000 paid to plaintiff—by reason of which when the jury rendered a verdict for $75,000 the court entered a judgment for that amount less the $10,000.

Most of the circumstances which led up to the accident are not seriously in dispute. En route home from a country dance, plaintiff, his two elder brothers, and Richard Emineth, were riding with Simpson in the 1967 Mercury Cougar he had purchased some ten days previously. Simpson was driving very fast, the testimony varying from estimates of over 100 miles per hour to 60 miles per hour; and at a point where there was a ninety-degree turn in the road, he went off the shoulder over an approach road from a field, into the borrow pit for two or three lengths of the car, and back on the road without stopping. He then traveled four or five miles at similar speeds to the point where the accident occurred, during which time he negotiated four or five more right-angle turns; when attempting to make one of these, the car began to slide to the left while continuing forward, went off the left side of the graveled roadway, turned over on its left side, and slid some distance in the borrow pit before coming to rest on its left side. Plaintiff, who was sitting in the middle of the back seat with two of the other passengers, was thrown against the left side of the vehicle; his left arm went out of the opened window and became trapped beneath the car as it slid and came to rest. With the aid of others he was able to get out of the overturned car and was taken to a hospital. He received treatment for the injuries over a considerable period, and at the time of the trial had some permanent disability.

Aside from the amount of the damages, the main issues in the case were whether the defendant manufactured and sold an automobile which had a defective rear axle that was unreasonably dangerous to the user and whether such defective condition, if one existed, proximately caused the automobile accident and resulting injury to plaintiff.[1] A crucial determination was

---

1. The parties stipulated that prior to September 20, 1967, Ford Motor Company was notified of a potential claim against it arising out of the operation of the automobile purchased by Simpson. On September 20, 1967,

a Denver representative of the Ford Motor Company gave a written receipt for the left rear axle of the automobile for laboratory tests by the company, stating in writing it was understood that the axle would be re-

the condition of the axle prior to the accident. The point at which the rear wheel was found bore upon this circumstance since if the axle did not break until the car had slid off the road the second time it would tend to show the breaking to be the result rather than the cause of the accident.

Defendant contends that the verdict and judgment should be reversed on six grounds, three related to the testimony of experts, a fourth to insufficient establishment of proximate cause for breach of warranty, a fifth to the erroneous admission of a surprise witness, and a sixth to the excessiveness of the damages.

It is argued that two expert witnesses called by plaintiff based their testimony on assumptions of the ultimate fact and responded to hypothetical questions which included facts which were assumed but were not in evidence. Specifically, it is complained that Professor Challender was requested to assume that the left rear wheel with the brake drum and a portion of the axle attached were found in the borrow pit approximately twenty-five to thirty feet to the rear of the place where the vehicle left the roadway and that starting back at some distance, approximately fifty to seventy-five feet before the vehicle left the road, drag or gouge marks were caused by the vehicle, and was asked on the basis of these assumptions if he had an opinion as to whether or not the axle was fractured prior to the time that the automobile left

the road and went into the borrow pit—whereas the record did not contain evidence that the wheel was found twenty-five to thirty feet prior to the place where the vehicle left the roadway or that there were fifty to seventy-five feet of drag marks on the roadway.[2] Similarly, defendant urges that Professor Crawford answered a hypothetical question regarding the matter on the assumption that the wheel with the tire and brake drum was found "some twenty-five to thirty, perhaps thirty-five [feet] approximately * * *, to the rear of the point on the shoulder where the car left the road," and was asked if he had an opinion as to whether or not the axle on the vehicle fractured and the wheel separated while the vehicle was still on the roadway—whereas there was no evidence in the record to sustain the assumed fact that the wheel was found twenty-five to thirty feet to the rear of the point where the car left the road.

Plaintiff responds that there was ample evidence in the testimony of Reynolds (allegedly a surprise witness, which point will be discussed later), a neighbor who the morning after the accident had gone to the scene, and further, that there was various other evidence of a circumstantial nature that would establish the factual basis.[3] This aspect of the case is troublesome. There can be no question about the rule that the factual basis of hypothetical questions must be accurately stated. Culver v. Sekulich, 80 Wyo. 437,

---

turned. Written requests for return of the axle were made on September 26 and November 13, 1968. On December 3, 1968, a representative of the Ford Motor Company said that the "parts" had been discarded by the Denver District Lincoln-Mercury Division because no one ever came for them.

2. While no testimony of drag marks continuing for fifty to seventy-five feet on the roadway was adduced, there was evidence of a "scuff mark" on the road with continuing marks progressively deeper until they were small grooves "from two to six inches" at the point where the car went over the edge and turned over.

3. Plaintiff points to the following as circumstantial evidence: Simpson shifted down to

a lower gear and there was no response; there was an unusual feeling about the automobile and the car seemed to want to sag; there was an unusual noise, a lot of noise and a lot of scraping, like being in a tin granary in a hail storm, the rocks and everything flying around the bottom of the car; the noise and the change of attitude of the car were experienced forty to fifty feet before the car left the road; the gouge marks on the road; the speed of the automobile was greatly reduced; there were corresponding marks where the bolts which hold the springs onto the axle were worn and polished as if they had been dragging on the ground—but no object or irregular surfaces were found in the borrow pit.

344 P.2d 146, 151. Here except for the circumstantial evidence there was seemingly a disparity between the facts as established by the testimony and those stated in the assumption presented to the expert witnesses. Reynolds did testify that the wheel and the tire were found twenty-five feet "behind" where the vehicle *went off the road*. Although at one point in cross-examination he said that the wheel was found approximately twenty to twenty-five feet *behind the car,* in redirect after this was brought to his attention he said the wheel and tire were "back anyhow that far [twenty to twenty-five feet] from where it [the car] went off the road." In such a situation the rule that the witness's testimony is no stronger than that developed by cross-examination[4] is not shown to be applicable, and we hold that it is not.

■■ In Culver v. Sekulich, supra, 344 P.2d at 151, we indicated it is sufficient if there are stated such facts as the proof fairly tends to establish and fairly presents the party's claim or theory. Here, although some confusion exists, there is evidence consonant with the facts stated in the questions; and the trial court did not abuse its discretion in overruling the objections.

Defendant's argument that the testimony of these same experts was founded on speculation, conjecture, and possibility, as well as matters outside the record and therefore inadmissible, really deals with the facet just discussed, but may merit some additional scrutiny.

Counsel points to the questions and answers of Professor Challender:

"Q. In arriving at your opinion that the fracture occurred prior to running off the road one factor you specifically mentioned as contributing to that was the location of the wheel, was it not? A. This is part of it.

"Q. And where are you assuming the wheel was as a basis of that opinion? A. From testimony that has been re-peated to me I'm led to believe that the wheel was located behind the area that the skid marks or gouge marks were located on the road and further behind the point at which the vehicle came to rest.

"Q. You are including in your opinion the assumption that the wheel was located either prior to the point that any marks were found on the road, is that correct? A. This is what I understand, yes.

"Q. And that's one of the important elements of your opinion, is that right? A. That is part of it."

Similarly defendant notes the testimony of both Professor Crawford and Professor Mosher, which reflected that these witnesses based their opinion on the wheel's being found twenty-five to thirty feet to the rear of where the car went off the roadway, whereas the testimony fails to so show. As we indicated previously, there is evidence which would support the facts stated in the questions to these witnesses.

Peripheral to this aspect is defendant's complaint that the court did not strike Professor Challender's testimony when he admitted that he may have considered the whole chain of evidence and could not overrule that he had borne in mind some things that he had read such as depositions. We are doubtful that such forthrightness of the witness as to the possible considerations on which his answer was based constituted a violation of the well-established rule on which defendant relies, that a hypothetical question is improper if it calls for an expert's opinion on the basis of reports not admissible in evidence. McCormick, Evidence, § 15, p. 34 (2 ed.).

■■ It is charged as error that a hypothetical question posed to Professor Mosher included as one of the assumed facts the opinions of earlier experts rather than the facts for which there was substantial testimony. We think that counsel misconceives the application of the rule. While expert testimony may not be based

4. Smith v. Beard, 56 Wyo. 375, 110 P.2d 260, 272.

upon the opinion of others, 2 Jones, Evidence, § 14:22 (6 ed., Gard), it may have as a foundation facts which have been established by an opinion. Although this subject has been discussed in many cases, we are impressed with that in Fowler v. Bachus, 179 Neb. 558, 139 N.W.2d 213, 215, where the distinction is well made, the writer there quoting 2 Wigmore, Evidence, § 682, p. 810 (3 ed.), that the basis for a hypothetical question may be either data observed or data inferred and that inferred data presented by expert testimony may equally well become a part of the basis for a hypothetical question.

■■ Defendant in arguing that there was no proof of proximate cause to support plaintiff's allegation of defendant's breaching express and implied warranties points out without contradiction by plaintiff that a warranty is not a guarantee of perfection or of the best quality. Counsel seek to bolster their assertion of failure to prove proximate cause by drawing an analogy between the present case and Continental Motors Corporation v. Joly, Wyo., 483 P.2d 244. However, the similarity of the two situations is insufficient to allow any real comparison. There can be no question concerning the propriety of the rule stated in Shipton Supply Co. v. Bumbaca, Wyo., 505 P.2d 591, 594, that circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty; but we are reluctant to say that this has not been accomplished here by plaintiff.

■■ Although there is earnest criticism of the court's allowing Reynolds, a neighbor who was not listed in the pretrial order as a witness, to testify concerning what he observed at the scene the morning after the wreck, this would seem to have occasioned no error. Plaintiff's counsel asserted that aside from the highway patrolman Reynolds was the only person other than parties to the litigation able to testify concerning the whereabouts of the car

and wheel after the wreck and that plaintiff had known nothing of the witness's knowledge until the day before the trial. The court permitted the witness to testify, allowing defendant the opportunity to question him before he went on the stand.[5] The listing of the witnesses who would testify at a trial is not only permissible under Rule 16, W.R.C.P., but is desirable and should be encouraged. However, the requirements of adherence to such pretrial orders are within the discretion of the trial court, whose rulings will not be overturned except where there is an abuse of discretion. Courts should generally recognize the binding effect of all matters in the pretrial orders, but this does not mean that there should be rigid or pointless adherence to them in a trial but rather that avoidance of possible hardship to parties and the accomplishment of substantial justice to the merits of claims should be among the factors which the trial court considers. Washington Hospital Center v. Cheeks, 129 U.S.App.D.C. 339, 394 F.2d 964, 965–966; Stewart v. Meyers, 7 Cir., 353 F.2d 691, 696; 6 Wright & Miller, Federal Practice and Procedure: Civil § 1527, p. 609 (1971).

■ Defendant prefaces its argument that the damages are excessive by acknowledging the necessary caution of reviewing courts in setting aside jury verdicts unless the award is so large as to indicate that the evidence was disregarded and the assessment was erroneously made, or said another way, that it denotes passion, prejudice, bias, or erroneous basis. Somewhat in that vein, plaintiff cites cases which indicate the difficulty of obtaining uniformity in the amounts of awards and that there is no real criterion a reviewing court can utilize to say that a judgment is excessive. However, defendant says that such errors can be inferred from the size of the verdict alone and submits that an examination of the evidence of the case clearly demonstrates that the damages awarded were the result of passion or

5. It is uncontroverted that plaintiff's intention to rely upon the facts about which Reynolds testified was known to defendant's counsel long prior to the trial.

prejudice and were totally unsupported by the evidence. Our analysis indicates no claim for loss of earnings by plaintiff either past or future. Dr. Hayward testified regarding the injuries that there was a compound fracture of the left radius and a fracture of the left ulna near the wrist joint. There was some difficulty, and some complications arose in the treatment requiring two operations. The doctor said that when he examined the plaintiff in 1971 the condition of the left forearm was that:

"* * * [plaintiff] had full extension of his elbow, the flexion was essentially normal of his elbow, perhaps five degrees short. I rated his grip to be seventy-five percent normal. Supination, that is turning of the palm up, was ten degrees short of normal. Pronation was thirty degrees short of normal; that is, the opposite direction. Fxtension of the wrist was about fifteen degrees short of normal. Flexion, ten degrees short of normal. Deviation of the wrist to both sides was rated ten degrees short of normal."

The doctor rated the permanent disability as impairment of 20 to 25 percent of the forearm, from the elbow down.

Numerous cases are cited by both parties, listing amounts that have been awarded by courts for injuries claimed to be more or less similar to those suffered by plaintiff. They are irreconcilable and furnish little guidance to us in this litigation. It is obvious that every case must be decided upon its own facts and that the jury should have wide latitude, but this does not mean that it should be without criteria in making the award. Here, admittedly, the plaintiff received a most painful injury, was forced to wear a cast for approximately eight weeks and in addition to the initial treatment required three surgical procedures, which were not completed for approximately ten months after the accident. The costs for medical treatment were stipulated to be $1,885, and as we previously indicated there was no claim for loss of earnings either past or future.[6]

6. Plaintiff's counsel in the brief state at length their justifications for the amount of damages awarded by the jury:

"* * * we must keep in mind that at the time of his injury Plaintiff was seventeen years old; capable of working and, in fact, working on his father's ranch when not in school; very athletically inclined and capable; liked music and played the piano well; and a person whose recreational interest was entirely devoted to physical activities.

"The injury and damage to this young boy began with the turnover of the vehicle in which he was riding, pinning and grinding his left arm between the vehicle and the ground. * * *

"His arm was pinned between the vehicle and the ground for some distance since his watch was found seven to twelve feet behind the car.

"His brothers jumped out of the car and attempted to rock it so that the Plaintiff might be able to remove his arm, but they only succeeded in lifting it some and dropping it back on the arm until Vern Harris came along to help, and then they were able to lift the car enough so the Plaintiff could get his arm out and leave the car.

"Even the most insensitive would have no difficulty understanding the excruciating pain and suffering he must have undergone in that experience and the terrible anxiety for the condition of his arm that a young boy like the Plaintiff must have experienced.

"When the Plaintiff first saw his arm, it was badly mangled; his hand was not aligned with his arm; the end of a bone was sticking through the flesh; blood was running down and gravel and dirt was imbedded in the flesh.

"No one at the ranch could do anything for him, so his father and his brother drove him 65 miles to Gillette, Wyoming, where they had to wait 1½ hours for a doctor and an anesthetist, the net result being he spent approximately four hours in the condition above described without relief or help or surcease from pain or reassurance.

"At approximately 6:30 or 7:00 a. m., on July 5, 1967, he underwent the first of four operations to be performed on his arm in the ensuing ten months, all under general anesthesia. Dr. Hannum tried, on two occasions, to set the bones in his arm, both of which were fractured, but without success. He was hospitalized in Gillette from July 5th to July 9th, aware that the bones were not set, that his hand and arm were swollen and infected, and was advised to seek help elsewhere.

We have given special attention to the amount of damages which the jury awarded to plaintiff, analyzing not only the evidence as to the medical care required by the injury with the attendant probable pain and suffering .but also the permanent disability as shown by the doctor's examination. In so doing, we have borne in mind the criterion that damages should compensate for loss but be susceptible of ascertainment with a reasonable degree of certainty. Blakeman v. Gopp, Wyo., 364 P.2d 986, 991, as well as those factors emphasized in the authorities cited by the litigants, including the impossibility of complete or ideal uniformity in the matter of

"On July 10th, he entered St. Vincent's Hospital in Billings, under the care of Dr. Sterling Hayward, an orthopedic specialist, in the condition above described. He was placed on antibotics until July 19th, at which time he underwent a second operation, only partially successful. Dr. Hayward testified that, because of the hazard of infection, open reduction of the fracture was impossible; both bones could not be positioned by manipulation, so he concentrated on the radius, the most important one, and left treatment of the ulna to a later time.

"So we see this young man, more than two weeks and two operations after his injury, painfully casted, with his hand fully flexed to maintain tension on the bone, and the ultimate result still in doubt. He was still in pain and anxious and uncertain as to his future.

"He wore the cast until August 30, 1967, and then two more operations followed, January, 1968, and May, 1968, in which the distal end of the ulna was removed, leaving it permanently unconnected at the wrist and moving freely in the arm.

"During all of this time, and continuing for a year and a half after his injury, he underwent physical therapy, both in the hospital and at home, to try to recover as much strength and motion as possible in the left wrist and arm. At the time the cast was removed, he was unable to move the wrist and elbow at all and it was necessary for him to undergo this, oft-times painful and always tedious, therapy in order to obtain the strength and motion that he eventually attained.

"In addition to his fractures, Dr. Hayward testified that probably the tendons, muscles and ligaments in that area and the structures in the wrist had been damaged in the accident.

"The net result of all the operations, treatment and therapy in an effort to alleviate and correct his injuries leaves the Plaintiff at time of trial with certain weaknesses and limitations of motion in the left hand, wrist and arm and certain disabilities which Dr. Hayward has testified are permanent.

"The limitations of motion in the wrist, arm and hand have been set forth in terms of degrees by Dr. Hayward, and he has made an estimate of impairment of the arm, from the elbow down, of twenty to twenty-five percent. However, Dr. Hayward has pointed out that his impairment rating has no real relationship to the Plaintiff's ability to do work or engage in activities in the future. Further, he made recommendations to the Plaintiff with respect to occupations and activities to the effect that he should not do things which put a lot of strain and stress on that arm and that if he did it would most likely worsen the condition of the arm.

"It should be noted * * * that at the trial Plaintiff demonstrated his difficulties to the Court and jury.

"Testimony was presented to the jury as to the difficulty he now experiences doing ranch work, some of which he can't do at all, and which before the accident he could do well.

"Surely, in the light of all this testimony it clearly appears that his capacity to work and earn have been severely diminished. True, he is going to college; true, he is studying psychology and true, the condition of his arm may not disable him from sedentary occupations, but who knows whether he would be capable in such occupations or even want to spend his life doing them.

"The fact of the matter is that any occupation requiring stress on that arm, and there are many of them, or dexterity of that arm and hand, such as typing or music or many others, are forever closed to him because of his injury.

"In addition, by far the greater part of the recreational activities which he enjoyed in the past, he can no longer do, in many instances not at all, and in others not well.

"He continues to have symptoms of pain which he believes are arthritic, and Dr. Hayward has testified that it is medically probable that he will have traumatic arthritis in his wrist.

"Dr. Hayward had cautioned the Plaintiff that he must be careful in what he does because of the ease with which the arm might be reinjured. This specter and the consequences thereof, haunt him now and will as long as he lives."

awarding damages for personal injury and the rule that the award is usually within the sound discretion of the trier of fact and will not be disturbed unless it is shown to be so excessive and unreasonable as to indicate passion or prejudice. Pan American Petroleum Corporation v. Like, Wyo., 381 P.2d 70, 76. After studying the record and considering all the facts and circumstances of this case in the light of applicable precepts, it is our view that there is insufficient evidence to support the award of $75,000, which is excessive and should be reduced by the amount of $20,000.

If plaintiff within thirty days hereafter files in this court a consent to accept judgment in the sum of $55,000, less the $10,000 paid by defendant Simpson, the verdict and judgment as so modified will be affirmed. If no such consent is filed, the judgment will be reversed and the cause remanded for new trial.

Affirmed as modified (under stated condition).