**CONTINENTAL MOTORS CORPORATION,**
a foreign corporation, Appellant
(Defendant below),

v.

Antonio V. JOLY, Appellee
(Plaintiff below),
and
Darr Services, Inc., a Wyoming corporation,
Appellee (Defendant and Cross-
Claimant below).

No. 3863.

Supreme Court of Wyoming.

April 1, 1971.

Rehearing Denied May 13, 1971.

Edward E. Murane and G. G. Greenlee, of Murane, Bostwick, McDaniel, Scott & Greenlee, Casper, for appellant.

G. L. Spence, Casper, Frank M. Andrews, Riverton, for appellee Antonio V. Joly.

W. Randall Boyer, Lander, for appellee Darr Services, Inc.

Before McINTYRE, C. J., and PARKER, McEWAN, and GRAY, JJ.

Chief Justice McINTYRE delivered the opinion of the court.

This is a products liability case involving an airplane accident. Suit was brought by the pilot, Antonio V. Joly, for bodily injuries suffered in the accident. The defendants were Continental Motors Corporation, manufacturer of the plane's engine; Darr Services, Inc., owner of the plane; and Wyoming Air Service, the firm that serviced the plane. Darr cross-claimed against Continental for loss of its plane. The appellant is Continental Motors Corporation.

Darr owned and operated an air taxi service which utilized a Navion model aircraft and transported passengers. The aircraft was equipped with an engine manufactured by appellant. The aircraft was maintained and serviced by Wyoming Air Service, a firm located at Riverton, Wyoming, one of the defendants.

On September 3, 1963, Joly was flying the Navion plane on behalf of Darr on a passenger-carrying trip from Lander, Wyoming, to Rapid City, South Dakota. After leaving Lander, he brought the plane into Wyoming Air Service at Riverton for correction of engine trouble. He reported the engine was "rough." The servicing mechanic found there was difficulty with three spark plugs, one of which was not functioning at all. These plugs were cleaned, re-gapped and replaced. Joly was told by the mechanic to run the aircraft up and bring it back if it was not all right. Apparently Joly then left for Rapid City.

Subsequently the plane was set down near Glenrock, Wyoming, somewhat off course for Rapid City. It ran into the upslope of a ravine and crashed. The passenger was killed and Joly suffered permanent disabilities from injuries received in the crash. His injuries were such that he had no recollection, at the time of trial, concerning events during or prior to the accident. He could not even testify to what transpired at Riverton. It was found, on post-accident examination of the plane, that the motor had failed and necessitated an emergency landing.

In addition to the engine roughness which Joly reported to Wyoming Air Service on the day of his ill-fated trip, Floyd Johnson, the mechanic and an officer for Wyoming Air, stated in his report to the Federal Aviation Administration (FAA) inspector, following the accident, that Joly had also reported the experiencing of engine roughness on a recent flight from Minnesota.

The jury which heard the case found against both Continental and Wyoming Air Service. It awarded damages to Joly in the amount of $310,000 against Continental and Wyoming Air Service. It awarded damages to Darr, for loss of its plane, in the amount of $20,038.90, against Continental. Judgment was entered according to the verdicts. Thereafter, Joly, Continental, and Wyoming Air entered into an agreement. Pursuant to said agreement, Wyoming Air paid Joly $80,000 and was released from further liability to him. It was agreed the sum of $100,000 would be credited on Joly's judgment in the event it was affirmed, and Continental approved this arrangement.

It is undenied that Joly was a 55-year-old pilot who had been decorated by the Canadian Air Force for service in World War II; that his experience included service in most of the old bi-wing planes; and before World War II he was one of four approved sky-writers in this country. As such, he flew over New York City doing advertising by spelling words with smoke from his plane. Not only did Joly have a great and varied experience in almost every kind of aircraft, from bombers on down, he was licensed by FAA

as a pilot, as a commercial pilot, and as a certified instructor of student pilots.

Since Joly was an employee of Darr, it goes without saying that the judgment in favor of Darr cannot stand unless Joly was free from negligence which contributed to the accident. Also, the judgment in his favor cannot stand unless he was free from contributory negligence.

■ We have said, in McKee v. Pacific Power and Light Company, Wyo., 417 P.2d 426, 427, and in Coleman v. Casper Diamond Jubilee, Inc., Wyo., 473 P.2d 600, 601, it seems to be well settled that there is no liability for injuries from dangers that are obvious, reasonably apparent, or as well known to the person injured as they are to the owner of the facilities in question.

Because the jury found in favor of both Joly and Darr, it must be assumed the jury found an absence of negligence on the part of Joly which contributed to the accident. However, the jury found against Wyoming Air Service. The jury therefore had to believe Wyoming Air was negligent in sending Joly on his way to Rapid City without doing more to find and correct the source of trouble in the Navion's engine.

Unless we assume mechanic Johnson had more expertise regarding the need for further mechanical work and the unsafe condition of the plane than did pilot Joly, we would have to adhere to the rule applied in *McKee* and *Coleman* and say Joly failed to exercise due care for his own safety.

However, we believe Joly and Darr have failed to carry the burden of proof imposed upon them of proving that negligence on the part of the manufacturer was a proximate cause of their injuries. Therefore, we need not decide whether Joly should be held contributorily negligent as a matter of law. The finding that Wyoming Air was negligent and that its negligence was a proximate cause of the accident is not disputed and is indeed tacitly conceded by all parties concerned in the appeal.

*Issues Involved*

The plaintiff and cross-complainant filed their complaints and proceeded up to the time of trial on the theory that defendant-Continental had negligently designed and manufactured the aircraft. Aside from allegations of negligence, claimants also asserted a right to recover on the theory of a warranty of fitness. These were the issues delineated by the claimants in their pretrial memorandums.

Subsequent to the pretrial conference Continental made answer to interrogatories propounded on behalf of Joly. In its answer Continental stated:

An "examination revealed that Piston #3 was burned through at the ring belt and that certain connecting rods and bearings failed as a direct result of oil starvation";

That "it was concluded that the cause of the piston failure was due to pre-ignition";

That "this conclusion was reached based upon experience and inspection of other engines in the industry with similar failures";

That "the appearance of the piston is one of typical pre-ignition and such failures have been documented for years in technical publications";

And that "no more positive determination could be made due to the fact that the piston in question could not be disturbed for metallurgical tests of any type."

As to whether the answers of Continental caused Joly and Darr to alter their theory of the case, we could only speculate and we will not pretend to do that. Suffice it to say Counsel for plaintiff-Joly made it known in his opening statement at trial that one of the theories upon which Joly would rely would be that the engine was manufactured by Continental with a magneto setting 4° above

its own specifications. Counsel for appellant says this was the first time that particular contention had been specified.

The matter of magneto settings was gone into during the trial. Then, at the conclusion of the evidence counsel for Joly moved to have his complaint amended to conform to the evidence, and in particular with respect to his claim of an improper magneto setting. There was strenuous objection by counsel for Continental, but the motion was allowed.

Of course, it cannot be determined whether negligence on the part of the manufacturer was a proximate cause of injury, or whether the manufacturer is liable on the theory of a warranty of fitness, without consideration of the acts or omissions of the servicing company. Failures in performance of duty by Johnson of Wyoming Air Service have been described by counsel for Joly in this manner:

"Floyd Johnson, at no single time during the three 100-hour inspections had ever given the engine a compression test. A compression test may have resulted in a discovery of the cracked piston. In addition, the record discloses that oil on a spark plug may mean a cracked piston, and Johnson discovered oil on one of the spark plugs which he removed from the airplane just before releasing the airplane to take off. Even at this time he made no compression test or further inquiry. Mr. Joly had complained of the rough engine. One of the spark plugs had oil deposits on it. Yet, no compression test was run, which test would take but a few seconds and is simply done by pulling the prop through and listening for escaping gas or air from a cracked or broken cylinder. This would have been a simple and positive test to find out whether or not the piston was leaking gas or air into the crankcase, and would have immediately alerted the mechanic to the fact that the piston was defective, and the airplane should not be flown without major repairs. This neglect on the part of Wyoming Air Service to discover the original manufacturing defect, joined with the negligence of Continental Motors so that, for the negligence of both, the engine failure would not have occurred."

It will be noted in the foregoing statements that counsel for Joly gives recognition to the neglect on the part of Wyoming Air Service to discover the alleged original manufacturing defect. We understand moreover that counsel for Joly and counsel for Darr have abandoned any claim that a flaw in Piston No. 3 was a proximate cause of the accident, except insofar as the alleged destructive pre-ignition caused by improper magneto settings may have operated more quickly on a weakness from a flaw in the piston.

We are justified in saying what we do about the position of claimants because Darr has adopted in general Joly's arguments and counsel for Joly has summarized their position by saying plaintiff contends the effect of pre-ignition was that it acted upon an area of weakness in the piston, which weakness resulted from a manufacturing defect left in the material of the piston; and this resulted in an ultimate burning, melting and failure of the piston.

We can best pinpoint the ultimate issue, as far as allegations of negligence are concerned, by quoting the following from Joly's brief:

"As we have seen then, the parties' only real dispute in the evidence is what caused the destructive preignition, plaintiff contending it was a result of Continental's negligence in releasing this engine with the magneto advanced beyond Continentals' own specifications so that the engine fired before it was designed to do so, while the defendant contended that the preignition was the result of other cause or causes."

*Regarding Metallurgical Defect*

From what we have said under the heading of *Issues Involved,* it will be seen we

are primarily concerned with the matter of magneto settings. However, at the trial, the plaintiff and cross-complainant spent much time with witnesses testifying as experts, in an effort to prove Piston No. 3 was manufactured with a metallurgical defect and weakness. We think this testimony deserves some attention before we discuss the matter of magneto settings.

Let us begin by pointing out, the portion of the piston where the defect is thought by plaintiff's witnesses to have been was burned away and is now gone. Hence, no witness was able to show the result of any test on the piston itself which showed a manufacturing defect. By contrast, in the case of Ford Motor Company v. Arguello, Wyo., 382 P.2d 886, rivets which were alleged to have been defective had popped out of the wheel of which they were a part and were preserved inside the tire. These rivets were then available for metallurgical tests, and the result of such tests were testified to.

In the case at hand, counsel for appellant argue that no competent expert testimony was introduced by claimants in their attempt to show a manufacturing defect. They point us to many pages in the record where witnesses for the claimants testified to possibilities and probabilities and a history of things that might have happened, all over objections by the defendant. Repeatedly, during the course of trial, testimony of this nature was allowed by the court with the understanding it would be connected up. There was in many instances, however, a failure to connect.

Typical of the expert testimony offered on behalf of claimants is the testimony of Dr. Donald T. Klodt, an associate professor of metallurgical engineering at Colorado School of Mines. The following are excerpts from his testimony:

"Q Now, you're not able to say exactly what the defect was, if any, are you? A No, sir."

* * * * * *

"Q Is it correct, Dr. Klodt, that your whole premise begins with the assumption that the third ring land failed due to a defect? A Yes, sir.

"Q However, you do feel that there are possibly other explanations for this failure? A There are other possible explanations."

* * * * * *

"Q You indicated that you had observed tool marks, as you refer to them. A No, I didn't.

"Q Oh, I misunderstood you. Did you find any tool marks in the ring grooves? A The piston is so battered up, I wouldn't attempt to identify any marks.

"Q I'm just asking you if you did, sir? A No, sir."

* * * * * *

"Q Now, you said in response to counsel's questioning that the defects are not visible. Now, could you tell the jury why? A The area has been obliterated, the failed area. There is metal missing, there is a hole through the piston."

* * * * * *

"Q In response to counsel's question, you said you couldn't be totally positive as to exactly what the defect was. Could you tell me why? A If I understand your question correctly, the area of failure is missing, the surface there is missing."

* * * * * *

"Q Now, these other defects that you say are all possibilities or probabilities, you're not saying under oath here that any one of them occurred? A No, sir. These are possibilities."

Mr. Howard Davis, an engineer from the University of Wyoming, also testified as an expert. He spoke of possible cracks in the piston but admitted he found none. He was referred to Dr. Klodt's statement about not being able to say what the defect was, if any, and was asked if he knew what the defect was, if any. He answered: "No, I don't know exactly, no."

From the record as a whole, we are convinced Joly and Darr failed to sustain the burden of proof that there was a manufacturing defect in Piston 3—except for the possible argument of counsel for Joly that the piston, when subjected to destructive pre-ignition, failed at a place which would not appear to be the weakest part of a normal piston. This brings us to a consideration of whether, under the evidence in this case, Continental can be held liable for whatever caused the destruction of Piston 3.

*Magneto Settings*

In passing to a consideration of the matter of magneto settings, we begin by saying Continental engineers were of the opinion—when the company answered interrogatories for Joly and throughout the trial—that the cause of the failure of Piston 3 was "pre-ignition." However, we must not lose sight of the fact that Continental does not have the burden of proving what caused such failure. It is clearly the responsibility and burden of the claimants to show by substantial evidence what caused the plane to go down.

As to what caused the accident, it has been conclusively decided that improper maintenance on the part of Wyoming Air Service was a cause. Our question now is whether Joly and Darr have proved there was another cause—one chargeable to Continental. If so, it has to be in connection with magneto settings.

Joly and Darr claim the proper setting for both magnetos on the engine owned by Darr was 20° B.T.C.; and that the engine in Darr's plane had the magnetos set at 24° B.T.C. when it left the manufacturer. As proof of this, there was offered in evidence a bulletin from Continental to all its distributors, dealers, repair and overhaul agencies, engine owners and operators dated February 7, 1962. This bulletin stressed the importance of establishing and maintaining correct magneto timing.

Attached to the bulletin for quick reference was a listing of the correct magneto timing settings for all Continental engine models. The setting for the model we are concerned with was shown on the attachment to be 20° for both magnetos. Darr's plane was manufactured in 1962. The *Log of Engine Test* shows the standard acceptance test was February 20, 1962. The *Aircraft Log* shows that it was certified by FAA for airworthiness on May 17, 1962. It is undisputed that the plane came out with both magnetos set at 24° B.T.C.

Thus, on the face of the exhibit dated February 7, 1962, it would appear the plane came out with the magnetos set 4° higher than what was recommended. The explanation offered by Continental's engineer who was responsible for the bulletin was that a 24° setting is the optimum setting for this engine; that such setting produces the greatest horse power and the most efficient operation of the engine.

However, from tests on airplane engines and despite constant warnings to make sure magnetos are properly set at each 100-hour inspection, Continental found the "normal advance" of magnetos was not being corrected to the specified setting by repair and overhaul agencies. Thus, according to Continental's testimony, the company determined that the engine could take a small drop in horsepower by altering the magneto setting to 20°, thereby building in some "slack" as protection for the engine as the magnetos advanced.

It is undisputed that, to accomplish such a change, it is always necessary to obtain FAA approval, just as it is necessary to have original specifications approved when the engine is first designed.

There are a number of Continental bulletins in evidence. They show the company had been giving repeated warnings about keeping the magneto settings checked and at the proper place. They also show, despite such warnings, engines were being damaged because of failure on the part

of service personnel to keep the magnetos where they should be.

According to the explanation of Continental's engineer who was responsible for this matter, the February 7, 1962, bulletin was put out when 24° was still the FAA approved setting for magnetos on the engine with which we are concerned; and the attachment originally attached to the February 7 bulletin showed the correct setting for this engine to be 24°. The witness testified 24° was still the approved setting when this engine was turned out. It was after that, in fact in June, 1962, he said, when the change to 20° was approved.

According to the explanation of the witness, the body of the February 7 bulletin was not then changed but the original attachment was removed and a new one attached in its place. The new attachment showed the correct setting as 20°. The exhibit offered by claimants, as Continental explains it, has the original date of February 7, 1962, and the substituted attachment which was affixed after FAA approval in June 1962.

Except for the exhibit introduced by plaintiff, with the 20° attachment, there was no contradiction in the evidence of Continental's testimony that 24° was in reality the optimum setting for Darr's engine and that the engine would produce the greatest horsepower and operate most efficiently at 24°. There is also no contradiction of the company's explanation that a change was actually approved by FAA in June 1962, and that the attachment to the February 7 bulletin was then changed. There is then no dispute of Continental's explanation that, when Darr's engine left the factory, the attachment to the February 7 bulletin showed 24° as the correct magneto setting.

Several bulletins issued by Continental to its dealers, owners, operators, and repair and servicing agencies were introduced in evidence. In these bulletins the importance of maintaining proper magneto timing was stressed. For example, a bulletin dated December 10, 1959, stated:

"With today's high performance engines, correct magneto timing is a matter of utmost importance. Magneto timing in advance of specified settings can cause detonation and even destructive preignition resulting in broken piston rings, cylinder scoring and piston burning."

Also, in the bulletin dated February 7, 1962, which claimants rely on so strongly, this pertinent language was contained:

"The importance of establishing and maintaining correct magneto timing on today's high performance engines cannot be over-emphasized. A continuing survey of magneto timing reflects a finding of 50 percent of the engines checked having magneto timing set in advance (some as much as 20°) of the setting specified for the engine.

"These advanced timing settings are believed in some cases to be the result of the erroneous practice of bumping magnetos up in timing in order to reduce RPM drop on single ignition. NEVER ADVANCE TIMING BEYOND SPECIFICATIONS IN ORDER TO REDUCE RPM DROP. We believe that perhaps too much importance is being attached to RPM drop in single ignition. RPM drop on single ignition is a natural characteristic of dual ignition design in modern engines. The purpose of the magneto check is to determine that all cylinders are firing. If all cylinders are not firing, the engine will run extremely rough and cause for investigation will be quite apparent. * * *"

It is important to notice that in these bulletins the company was talking about an alarmingly high percentage of cases where timing was advanced "far beyond specified settings." It emphasized the importance of magneto timing check and readjustment as *required* at each 100-hour inspection. And particularly, in the February 7, 1962, bulletin, the company pointed out that 50 percent of the engines checked were being found to have magneto timing

set in advance of the specified setting—"some as much as 20°" above.

Witnesses for Continental testified magneto settings, with wear and use of an engine, have a tendency to change; and this is the reason that it is considered one of the things to be examined on each 100-hour inspection. If this were not so, there would be no need to reset or recheck. Also, one of the witnesses described how the company was continually finding magnetos advanced. Because this engine was "fat in power," the witness testified, the company decided it could take about one and a half horsepower drop in power from the optimum and take the four-degree-cushion to aid in this problem.

There is no dispute or contradiction in the evidence of Continental's testimony concerning the optimum setting for the engine model in question, nor concerning reasons for changing the recommended setting from 24° to 20°.

Also, there is no dispute or contradiction in the evidence of those things claimed by Continental in its bulletins. This includes such claims as a finding that 50 percent of the engines checked had magneto timing set in advance of the specified setting; that there was an alarmingly high percentage of cases where the setting was "far beyond specified settings"; that some of these settings were as much as 20° above the proper setting; that the advanced timing settings are believed in some cases to be the result of the erroneous practice of "bumping" magnetos up in timing to reduce RPM drop; that the purpose of the magneto check is to determine that all cylinders are firing and if all cylinders are not firing, the engine will run "extremely rough" and cause for investigation will be quite apparent.

It might be worth calling attention at this point to the fact that Joly reported engine roughness on a flight from Minnesota. Then, on the day of his ill-fated trip, he set his plane down at Riverton for servicing after flying only from Lander to Riverton (about 25 miles), with a report that the engine was rough.

## The Critical Question

The important question for us is not where the magnetos were set February 20, 1962, when the engine was checked by the manufacturer, but where were they on September 3, 1963, when the motor failed? Unfortunately, no evidence was offered by the claimants to show what the magneto settings were at the time of the crash, or at any time between February 20, 1962, and September 3, 1963. One of Continental's engineers testified that, based on his experience with the engine model here involved, the magnetos would have advanced from 24° to about 34° at the time of crash, if not checked in the meantime.

In the light of the evidence we have described, it is doubtful if it can be inferred that magnetos were still at 24° at the time of the accident. If Wyoming Air Service had "bumped" the magnetos or changed them at all, then Continental could not be held responsible. On the other hand, if Wyoming Air Service failed to change from 24° down to 20° in accordance with the bulletin instructions, and if it failed to check the magneto settings on the 100-hour inspections, Continental's liability would be doubtful.

Johnson, of Wyoming Air Service, admits his company had all of the applicable service bulletins issued by Continental prior to any of the 100-hour inspections. Also, it is undisputed the engine with which we are concerned had logged 390 hours at the time of the crash. The record shows without contradiction that FAA regulations require a 100-hour inspection at the end of each 100 hours of service. The 100-hour inspection, among other things, includes a check of the magneto settings and a compression test.

Johnson's testimony was confusing and contradictory as to whether he had checked magneto settings or made compression tests at any of the 100-hour inspections

made by him. As previously indicated, counsel for Joly contends he did none of these things, and the jury was entitled to believe, and apparently did believe, such accusations against Johnson were for the most part true. Here again, we quote arguments made by Joly's attorney in his brief:

"It was admitted and uncontested by defendant Wyoming Air Service that they had all the applicable service bulletins issued by Continental Motors Corporation prior to the time of the first 100-hour inspection made on the aircraft, and that such inspections were made on the 11th day of November, 1962; the 23rd day of February, 1963 and the 15th day of May, 1963.

"That the mags were never changed is in conformity with Johnson's statement to the FAA in his own handwriting (which was given before the filing of the lawsuit), and with the assertion of his assistant, Maxson, who states that the mags were 'never messed with.' The inconsistency of Johnson's statements during the trial as to when, if ever, the mags were changed speaks for itself on the question of credibility."

■ The two Continental bulletins we have made particular reference to and quoted from (dated December 10, 1959 and February 7, 1962) were offered in evidence on behalf of Joly and Darr. In addition to these bulletins, we have referred to considerable evidence offered on behalf of Continental, which was not contradicted or disputed in any way. However, realizing the jury has great latitude in accepting or rejecting testimony of experts and other witnesses, we turn back again to claimants' burden of proof.

Was it proved by substantial evidence that the particular engine we are concerned with would destroy in 390 hours on account of having the magnetos set at 24° B.T.C. instead of at 20°? That seems to be the ultimate and critical question.

■ In dealing with this question, we must keep in mind that no inference of negligence can be based on mere surmise, guess, speculation or probability. Tower v. Horn, Wyo., 400 P.2d 146, 147; Gerdom v. Gerdom, Wyo., 444 P.2d 34, 37.

■ In examining the evidence presented by Joly and Darr, we find their witnesses testified about airplanes in general and not about the particular type with which we are concerned. Moreover, there was no attempt to take into consideration the magneto setting approved by the FAA and the one the engine was designed for at the time of its manufacture, or the actual optimum setting for the particular engine.

In general, the witnesses for claimants expressed only probabilities and generalities when testifying about the effect of advanced magneto settings. For example, a mechanic from Denver Beechcraft thought, if a plane were to operate over 300 hours with magneto settings 4° higher than "specified" by the manufacturer, there would be a probability of it reducing the life of the engine and "it would be probable the engine would fail." Also, despite claimants' efforts to discredit the testimony of Johnson, claimants seek to rely on him for an expression of *probability* in the following testimony:

"Q And wouldn't you also say as an expert mechanic and based upon your opinion that it's probable that an aircraft engine would fail in two to three hundred hours with its mag setting as much as four degrees higher than the setting specified by the manufacturer? A I'd say yes, it's possible.

"Q And wouldn't you say that it is a probability? A Yes."

On the matter of magneto settings, Joly and Darr also seek to find some comfort in the testimony of two of Continental's engineers. Counsel try to support the proposition that the engine would fail with an advance of only four degrees (from 20° to 24°). They say of these witnesses, they "thought that was possible." The record does not, however, bear out what counsel claim. The witnesses did not so testify. One engineer did answer a hypothetical

question about a magneto setting of 13° above the original 24° to the effect that in such a case engine failure might be expected. Even at best, counsel are still talking only about what is "possible."

### Implied Warranty

The attorneys for appellees argue, facts which support their claims for negligence are also supportive of a cause of action in implied warranty. They point out the latter action merely requires proof that the engine failed as a result of its manufacture, and that such failure was the direct and proximate cause of the crash and injuries. Negligence, of course, requires the additional proof that not only did the engine fail but also that such failure was the result of defendant's neglect in using reasonable care under the circumstances in the manufacture, design or inspection of the engine.

If it were found that the engine in question failed as a result of its manufacture, and that such failure was a proximate cause of injury, then it might follow that the manufacturer had breached its implied warranty of fitness. In arguing for implied warranty, appellees are assuming they have sufficiently proved the Darr engine failed as a result of an improper magneto setting at the time of manufacture, which caused a manufacturing defect in the piston to fail, thereby resulting in the engine's failure.

■ Our situation then is that appellees recognize they cannot rely on an implied warranty without proving (1) that the engine failed as a result of a defect in its manufacture; and (2) that such failure was the direct and proximate cause of the crash and injuries. We have previously pointed out appellees are not claiming a flaw in Piston 3 was a proximate cause of the accident, except insofar as the alleged destructive pre-ignition caused by improper magneto settings may have operated more quickly on a weakness from a flaw in the piston.

■ For reasons we have set out in considerable detail, it is apparent we find ap-

pellees have failed to sustain their burden of proof in these respects: (1) Except for testimony based on unacceptable speculation and possibilities or probabilities, there is no substantial evidence that Piston 3 contained a flaw or manufacturing defect; and (2) except for the same kind of unacceptable testimony, there is no substantial evidence that failure of the plane's engine was caused by its magnetos being set at 24° B.T.C. at the time of manufacture.

On the other hand, as we have heretofore indicated, the most that the evidence of appellees establishes is that the motor of the Darr plane failed because of improper maintenance and servicing inspection. Therefore, recovery cannot be had for breach of an implied warranty of fitness.

Following the verdicts in this case, defendant Continental moved for judgment notwithstanding the verdicts. This motion should have been granted. Accordingly, the trial court is instructed to vacate the judgment against Continental and to enter judgment for Continental, notwithstanding the verdicts of the jury.

Reversed.

Mr. Justice McEWAN, dissenting.

The aircraft was manufactured on May 17, 1962, and purchased by appellee, Darr Services, Inc., shortly thereafter. There is no question that the engine in question left the factory of Continental with a magneto setting of 24° B.T.C., and there was sufficient evidence for the jury to have found that the magneto setting had not been changed from 24°. There was a service bulletin from Continental dated February 7, 1962, (at least 13 days before the engine in question left Continental's factory). This bulletin is referred to in the majority opinion under the heading of "Magneto Settings," and shows that the magneto setting for the engine in question should be 20°. In addition to the portion quoted

in the majority opinion, the bulletin also says:

"Magneto timing advanced beyond the setting that the engine was designed for and qualified with can cause detonation and/or pre-ignition resulting in broken rings, cracked and burned pistons and abnormal and excessive stresses induced into cylinder heads, cylinder barrels, crankcase, crankshaft and connecting rods. In a detonating cylinder, the temperatures and pressures rise to abnormal heights. The alloys from which the pistons are made were not intended to withstand this amount of heat. As a result, piston rings warp and lands under the top ring may wear excessively. This permits increased fluttering and hammering of the top ring which can break the ring and even the piston lands. * * *"

This is apparently what happened to this engine. There was testimony that the magneto setting could advance as much as 3° between 100-hour inspections, and also that it was dangerous to permit an aircraft engine to have a magneto setting as much as 4° above the specified setting, and, if it continued for 200 to 300 hours, there was a probability of engine failure. The engine in question had 390 hours on the date of the failure and crash.

Witnesses for Continental testified that the bulletin dated February 7, 1962, specifying that the magneto setting should be 20° was really not sent from the factory until June of 1962. I think it was a jury question as to when the bulletin was sent. In any event, on June 16, 1962, Continental sent another bulletin which said to change the magneto setting to 20°, and " * * * After the timing has been reset, scrape off the present painted timing setting on the nameplate and steel stamp or etch in the revised setting of 20°. This also requires a log book entry."

The magneto setting of 24°, together with the normal advance of the magneto setting between 100-hour inspections, created a dangerous condition of which the defendant-Continental was—or should have been—aware.

That it takes a rather high degree of skill, training and experience to service airplanes, and that owners and pilots must necessarily look to such skilled people, is widely known and was surely known by Continental. Mr. Floyd M. Johnson, who is president of Wyoming Air Services, is a licensed mechanic holding ratings of A. & P. (airframe and power plant), and A. I. (air inspector). He testified that pilots and owners of aircraft rely on the mechanics' skill and judgment in determining the airworthiness of an airplane. Continental was aware that many repair and overhaul agencies were not properly setting the magnetos. Its bulletin of December 10, 1959, said:

"A recent survey of magneto timing checks conducted on engines flown in to our service hangar as well as engines returned from the field to our Service Department revealed an alarmingly high percentage of cases where timing was advanced far beyond specified settings. * * *"

Continental's bulletin of February 7, 1962, contained the following language:

" * * * A continuing survey of magneto timing reflects a finding of 50 percent of the engines checked having magneto timing set in advance (some as much as 20°) of the setting specified for the engine."

Thus, Continental, by its own admission, was aware that some service agencies were not complying with its bulletins regarding magneto settings.

The defendant-Continental had a responsibility to this plaintiff and cross-complainant to reasonably see that the change in the magneto settings was made. I think that under these circumstances something more was required of the defendant-Continental than the mere sending out of a warning bulletin, and a bulletin advising that the magneto setting change should be made and the nameplate changed.