Craig CALDWELL, Appellant (Plaintiff),

v.

YAMAHA MOTOR CO., LTD. of Japan, Yamaha International Corporation, and Yamaha Motor Corporation, U. S. A., Appellees (Defendants).

No. 5586.

Supreme Court of Wyoming.

July 19, 1982.

Lawrence A. Yonkee and Michael K. Davis, Redle, Yonkee & Arney, Sheridan, for appellant.

Jeffrey J. Gonda and Dan B. Riggs, Lonabaugh & Riggs, Sheridan, for appellees.

Sharon A. Fitzgerald, Cheyenne, for amicus curiae Wyoming Trial Lawyers Association, amicus curiae Committee.

Before ROSE, C. J., RAPER, THOMAS and ROONEY, JJ., and TAYLOR, D. J.

ROSE, Chief Justice.

Plaintiff-appellant Craig Caldwell brought suit against Yamaha International Corporation, motorcycle dealer Harold F. Jensen d/b/a City Cycle Center, Yamaha Motor Co., Ltd. of Japan, and Yamaha Motor Corporation, U.S.A., for injuries he received as a result of what he alleges to have been a design defect in a motorcycle manufactured and marketed by the defendants. He assigned liability on theories of breach of implied warranty, negligence and strict liability in tort under § 402A of the Restatement of the Law Second, Torts.[1] The

---

1. Section 402A, Restatement of the Law Second, Torts, provides:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Instruction No. 4 as given by the trial judge in this case substantially tracked § 402A and is as follows:

"The Plaintiff, Craig Caldwell, is entitled to recover from the Defendants for his injuries

case went to the jury on the theory of strict liability only and thus strict liability under § 402A of the Restatement became the law of the case even though the question of whether or not strict liability under § 402A is the law of this state is not before us for decision. At the close of all the evidence the judge dismissed all claims against defendant Harold F. Jensen d/b/a City Cycle Center. The jury returned its verdict for the defendants on May 20, 1981 and Mr. Caldwell appeals, urging the following issues:

1. Is Rule 407, W.R.E., inapplicable in a products-liability case so that the trial judge erred in instructing the jury that it was not to consider the fact that the replacement part had a steel spring guide rather than an aluminum one in determining whether the motorcycle was defective?

2. Did the trial court commit reversible error in permitting defendants' witness to testify as to the absence of previous accidents involving Yamaha front forks?

3. Was error committed by the trial court in allowing a defense witness, who had not been listed on the pretrial order, to testify?

4. Were the instructions and warnings accompanying the motorcycle inadequate as a matter of law as to require the granting of a new trial?

We will affirm.

## FACTS

The injury which brings on this appeal was suffered by the appellant on May 28, 1978 at a reservoir area north of Sheridan.

On that day, Craig Caldwell and friends had driven to the Tongue River Reservoir to picnic and enjoy the surroundings. Craig brought his 1975 Yamaha MX250b motorcycle which he had purchased new in 1977 from a local Sheridan dealer, City Cycle Center, and which, prior to the day, he had used without incident. While riding the motorcycle up an incline on an access road that day, something went wrong and the bike began turning over in the air. When it came to rest, Craig was lying on the ground next to the motorcycle, severely injured.

Several of Craig Caldwell's friends witnessed the mishap and all of them testified that they had seen Craig accelerating up the hill when suddenly it appeared as if the front end of the motorcycle dug into the ground and began flipping through the air until, after three complete revolutions, it finally came to rest. Craig's friends ran to his aid, and they observed that the front wheel of the cycle was separated from the upper portion of the front forks and, after the mishap, was connected by only the brake cable. Most of the eye witnesses could not specifically recall whether the front wheel was attached while it somersaulted through the air, but one of them remembered that on each revolution the front wheel would strike the ground. This witness also said that the vehicle had started flipping because the front wheel had fallen off. Craig had no recollection of the events surrounding his accident.

Taken as a whole, the evidence was such as to structure a conflict on the issue of whether the front wheel came off *before* or *after* the somersaulting of the cycle.

provided you find the following from the evidence:

"1. The Defendants were engaged in the business of selling a Yamaha motorcycle, Model No. MX250B, which was purchased by the Plaintiff.

"2. The motorcycle was in a defective condition unreasonably dangerous to persons who might be expected to use the motorcycle.

"3. The motorcycle was in a defective condition at the time it left the control of the Defendants.

"4. The motorcycle was expected to reach and did reach the hands of the Plaintiff without substantial change in the condition in which it was manufactured or sold.

"5. The defect in the motorcycle was the cause of the Plaintiff's injuries and damages.

"This rule applies although the Defendants used all possible care in the preparation and sale of the motorcycle."

In preparation for trial, the motorcycle was examined by an expert in physical metallurgy. This witness decided that two aluminum alloy spring guides had fractured and caused the wheel to separate from the upper portion of the front forks. However, he could not say when the separation had occurred—i.e., had it happened *before* or *after* the bike somersaulted?

The purpose of the spring guides is to hold the lower and upper tubes of the front forks of the Yamaha MX250b together. In the 1975 model owned by appellant, these guides were made of cast aluminum alloy. After the 1975 model production, Yamaha requested several modifications in the design and function of the front forks and, in response, the manufacturer changed the spring guides from aluminum alloy to steel.

At trial, Caldwell attempted to prove that the front fork design in the 1975 MX250b was defective because aluminum alloy was not as strong as steel. The plaintiff's expert testified that, in his opinion, given the forces necessarily absorbed by the spring guides under normal operating conditions, steel was better than aluminum alloy since it is not adversely susceptible to the variable characteristics of impact and force as is the case with aluminum. The expert believed that the spring guides had fractured over the course of an extended period of time. However, he did agree that, with the application of a sudden and unusual amount of force, the spring guides might fail on impact. His testimony emphasized that the replacement part ordered for the Caldwell machine in 1980 contained steel spring guides rather than aluminum alloy ones and that steel is stronger than aluminum alloy. The expert went on to offer an opinion to the effect that the spring guide in the Caldwell motorcycle was defective but he could not say what caused the accident. He could only express a judgment as to the cause of the breakage of the spring guide. In other words, he was not able to say that the spring guide gave way, causing the wheel to detach, causing the fork to dig into the ground with resultant somersaulting, impact and injury to Craig Caldwell.

In contrast, the defendants-appellees called experts who expressed the opinion that the spring guides had failed instantly as a result of a single, heavy impact, the inference here being that the disputed part either did give way or could have given way *after* the somersaulting cycle struck the ground rather than *before*. The defense experts further opined that an adequate supply of oil in the front forks of the MX250b was essential to their proper operation and a lack of oil increased the likelihood that the spring guides would fail. It was their belief that there probably was insufficient oil in the forks at the time of the incident in question.

An engineer for Kayaba Industry, the manufacturer of the front forks on the MX250b, testified for defendants-appellees about the research, development, and manufacturing process pertaining to the forks on the Caldwell machine. He explained that the reason for the steel guides in the 1980 replacement part was that aluminum alloy guides were not then available. He recalled an order from Yamaha to his company which directed that various aspects of the front fork design be altered for purposes of improving the ride features of their motorcycles and it was for this reason that his company undertook to install steel instead of aluminum alloy spring guides. This, according to the expert, explained the presence of steel guides in Craig Caldwell's 1980 replacement part and he emphasized that their presence did not indicate that aluminum alloy had rendered the product less safe than steel.

This witness was permitted to testify that, to his knowledge, no complaints about the front forks with aluminum guides had been reported except in this particular instance. Appellant's counsel objected to this testimony on the grounds that it was irrelevant in strict-liability products litigation and that its introduction was prejudicial to the plaintiff's case.

The judge ultimately instructed the jury to disregard the evidence concerning the presence of steel guides in the replacement

part, to which instruction counsel objected timely and strenuously.

## INSTRUCTING THE JURY TO DISREGARD THE EVIDENCE OF STEEL SPRING GUIDES IN THE REPLACEMENT PART

Appellant Caldwell argues that the trial judge was in error when he instructed the jury to disregard the fact that steel rather than aluminum guides were used in the 1980 replacement front forks. He contends that the judge erroneously relied upon Rule 407, W.R.E.[2] because the provisions of that rule were not intended to apply in a strict products-liability case tried and submitted according to the concepts announced by § 402A of the Restatement (supra, n.1).

Even so, at the close of the evidence the trial judge gave the following instruction:

"The fact that in 1980 the spring guides in Yamaha front forks were made of steel is not to be considered by you in determining whether or not the parts in Craig Caldwell's motorcycle were defective."

Although we agree with appellant that the proscriptions of Rule 407 are not applicable to strict-liability concepts, we do not agree that the trial judge erred in instructing the jury to disregard the evidence.

The constraints upon Rule 407, W.R.E.[3] are designed to exclude evidence of remedial measures which are offered as evidence of negligence or culpable conduct. The reason for the rule is to encourage after-the-fact repairs and corrections, and, it is argued, if these desirable efforts are to be admitted to prove negligence, then the threat that such remedial activity would be used against defendants would discourage their undertaking. See: 2 Louisell and Mueller, Federal Evidence, § 163, p. 235 (1978). It is clear from the language of the rule itself that it is only intended to apply when the evidence is offered to prove "negligence or culpable conduct." Caldwell argues that, since neither negligence nor culpability is in issue in a strict-liability action, Rule 407 is not applicable. For this reason, he says, the trial judge erred in instructing the jury to disregard the evidence of the steel spring guides in the 1980 replacement part. In support he relies upon committee notes which suggest that Rule 407 is not to be applied in a strict-liability action.[4]

Appellees, on the other hand, urge that the language of Rule 407 specifically permits the use of evidence of subsequent repairs to show ownership, control or feasibility, or for impeachment purposes. They argue that the rule's limited admissibility provisions should control for the reason that, in these respects, the policies supporting the strictures of Rule 407 are just as applicable to a strict-liability case as to any other. Our review of the authorities leads us to conclude that appellant argues for the better rule.

Both parties correctly point out that the authorities are divided on this question. Appellant's position is best exemplified by *Ault v. International Harvester Company,* 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148 (1974).[5] In Ault the court was faced with a question of the admissibility of evidence to the effect that the manufacturing defendants had changed the design of a gearbox. The plaintiff contended that the

2. Rule 407, W.R.E. provides:

"When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment."

3. For the full text of the rule see n.2, supra.

4. This committee note says:

"Rather than recommending an amendment, the Wyoming Committee states that it interprets 'culpable conduct' as not encompassing breach of warranty or strict liability. See *Ault v. International Harvester Co.,* 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148 (1974), and *Robbins v. Farmers Union Grain Term. Ass'n,* 552 F.2d 788 (8th Cir. 1977)."

5. Although the California rule is not identical to Rule 407, W.R.E., its provisions are substantially the same.

aluminum material used in the gearbox of his vehicle was defective and the trial court permitted him to show that, in later models, the gearboxes were made of malleable iron, a stronger metal. In upholding the admission of this evidence the California Supreme Court stated:

"Nevertheless, courts and legislatures have frequently retained the exclusionary rule in negligence cases as a matter of 'public policy,' reasoning that the exclusion of such evidence may be necessary to avoid deterring individuals from making improvements or repairs after an accident has occurred. Section 1151 rests explicitly on this 'public policy' rationale. In explaining the purpose of the section, the draftsmen's comment states: 'The admission of evidence of subsequent repairs to prove negligence would substantially discourage persons from making repairs after the occurrence of an accident.' * *

"While the provisions of section 1151 may fulfill this anti-deterrent function in the typical negligence action, the provision plays no comparable role in the products liability field. * * *

"When the context is transformed from a typical negligence setting to the modern products liability field, however, the 'public policy' assumptions justifying this evidentiary rule are no longer valid. The contemporary corporate mass producer of goods, the normal products liability defendant, manufactures tens of thousands of units of goods; it is manifestly unrealistic to suggest that such a producer will forego making improvements in its product, and risk innumerable additional lawsuits and the attendant adverse effect upon its public image, simply because evidence of adoption of such improvement may be admitted in an action founded on strict liability for recovery on an injury that preceded the improvement. In the products liability area, the exclusionary rule of section 1151 does not affect the primary conduct of the mass producer of goods, but serves merely as a shield against potential liability. In short, the purpose of section 1151 is not applicable

to a strict liability case and hence its exclusionary rule should not be gratuitously extended to that field." 117 Cal. Rptr. at 815, 528 P.2d at 1151–1152.

The position expressed in Ault was also adopted in *Robbins v. Farmers Union Grain Terminal Ass'n*, 552 F.2d 788 (8th Cir. 1977), where the court was construing the federal rule which is identical to ours. The court in Robbins construed the "negligence or culpable conduct" language as describing the confines of the rule and, since the due care or culpability of the manufacturer was not an issue in a strict-liability action, the exclusionary rule was not applicable. Id. at 793. For similar holdings, see: *Caprara v. Chrysler Corporation*, 52 N.Y.2d 114, 436 N.Y.S.2d 251, 417 N.E.2d 545 (1981); *Shaffer v. Honeywell, Inc.*, S.D., 249 N.W.2d 251 (1976); *Millette v. Radosta*, 84 Ill.App.3d 5, 39 Ill.Dec. 232, 404 N.E.2d 823 (1980); *Unterburger v. Snow Co., Inc.*, 630 F.2d 599 (8th Cir. 1980).

Courts that have taken the opposite position express the opinion that the public-policy reasons behind excluding evidence of subsequent repairs are just as applicable to strict-liability actions as any others. In *Werner v. Upjohn Co., Inc.*, 628 F.2d 848 (4th Cir. 1980) the court stated:

"Plaintiff argues that a fundamental distinction exists between negligence and strict liability since in a negligence action it is the reasonableness of the defendant's conduct which is in issue while in a strict liability case the issue is whether the product is unreasonably dangerous. Thus, the argument goes, in a negligence action the focus is on the defendant while in strict liability the focus is on the product. We concede the obvious distinction between negligence and strict liability, but we do not believe that this distinction should produce a different result. The rationale behind Rule 407 is that people in general would be less likely to take subsequent remedial measures if their repairs or improvements would be used against them in a lawsuit arising out of a prior accident. By excluding this evidence defendants are encouraged to make

such improvements. It is difficult to understand why this policy should apply any differently where the complaint is based on strict liability as well as negligence. From a defendant's point of view it is the fact that the evidence may be used against him which will inhibit subsequent repairs or improvement. It makes no difference to the defendant on what theory the evidence is admitted; his inclination to make subsequent improvements will be similarly repressed. The reasoning behind this asserted distinction we believe to be hypertechnical, for the suit is against the manufacturer, not against the product." 628 F.2d at 857.

Other courts have followed a similar line in holding that evidence of subsequent repairs should only be admissible where feasibility, control or ownership are controverted, or where admissible for impeachment purposes. See: *LaMonica v. Outboard Marine Corporation*, 48 Ohio App.2d 43, 355 N.E.2d 533 (1976); *Cann v. Ford Motor Company*, 658 F.2d 54 (2nd Cir. 1981); *Lavin v. Fauci*, 170 N.J.Super 403, 406 A.2d 978 (1979); *Oberst v. International Harvester Company, Inc.*, 640 F.2d 863 (7th Cir. 1980). It appears that these authorities consider the limited-admissibility portions of the rule to be controlling, rather than the negligence or culpable-conduct language.

In our opinion, the correct construction of Rule 407, W.R.E. is that the exclusionary purposes of the rule are only to be applied in cases where the negligence or culpability of the defendant is at issue. Thus we agree with the committee note that Rule 407, W.R.E. is not applicable to cases arising under the strict-liability principles of § 402A. For a similar position, see: 2 Louisell & Mueller, supra, § 164, p. 247. As *Ault v. International Harvester* suggests, the policy reasons behind the exclusionary principles of Rule 407 cannot logically be applied to the mass producer being sued by an injured user of his product.

Notwithstanding this conclusion, we still agree with the appellees that the trial judge acted properly in instructing the jury to disregard the presence of the steel spring guides in the 1980 replacement part. We come to this decision because a review of the record has failed to disclose substantial evidence which proved or tended to prove that the original aluminum parts were replaced with steel parts because the aluminum guides were defective. All that the evidence shows is that the motorcycle upon which Caldwell was injured had aluminum spring guides and that the 1980 part contained steel ones which were made of a stronger material. Other than this, there is no evidence, circumstantial or direct, that would allow the jury to infer that the use of the steel guides in the replacement part was occasioned by the fact that aluminum was not an adequate or safe material. On the other hand, the only evidence presented at trial explaining the reason for the change was that which was advanced by Yamaha. The appellee's expert testified that the reason the company converted to steel was that various principles in the design of the forks were changed for the purpose of developing a smoother ride. He related that, since the production of the new forks in 1976, the aluminum molds had been scrapped. Thus, when the replacement part was ordered for the Caldwell machine, steel spring guides were all that were available.

With these facts in mind, we consider the case at bar to be similar to *Continental Motors Corporation v. Joly*, Wyo., 483 P.2d 244 (1971), a products-liability contest tried on a warranty-of-fitness theory. There, in discussing the evidence concerning a metallurgical defect, we said:

"They point us to many pages in the record where witnesses for the claimants testified to possibilities and probabilities and a history of things that might have happened, all over objections by the defendant. Repeatedly, during the course of trial, testimony of this nature was allowed by the court with the understanding it would be connected up. There was in many instances, however, a failure to connect." 483 P.2d at 248.

In the instant matter there was also a failure to connect the evidence—that is, there

is no evidence to the effect that the change to steel springs was brought about because the aluminum ones were defective, unsafe or had caused any structural failures. There is no evidence that the change was undertaken for remedial purposes. It follows, therefore, that the judge was required as a matter of law to instruct the jury to disregard the evidence. It is never error for the trial judge to consider the state of the evidence in fashioning instructions to the jury. *Kahn v. Traders Insurance Company*, 4 Wyo. 419, 34 P. 1059 (1893). It is also well established that instructions which are given must be sustained by the evidence. *Gilliland v. Rhoads*, Wyo., 539 P.2d 1221 (1975); *Langdon v. Baldwin-Lima-Hamilton Corp.*, Wyo., 494 P.2d 537 (1972). In this case, the instruction was proper because it was designed to prevent the jury from conjecturing or speculating as to the existence of a defect which was not shown by the evidence to be present. *Continental Motors Corporation v. Joly*, supra.

## PREVIOUS–ACCIDENTS TESTIMONY

Appellant assigns error to the trial judge for permitting defendants' expert to testify to the absence of any prior reports concerning the failure of the front forks on other similar motorcycles. At trial the witness was permitted to testify, over objection, that he had traveled extensively over the world to motorcross races, that he had spoken to many recreational riders, and that he had not encountered any complaints with respect to the front forks. Prior to admission of the testimony, appellant had objected on the grounds that such evidence was irrelevant in a strict-liability action. He now urges the same position here. Even though at the time the evidence was admitted appellant was relying upon alternative theories including negligence, since the case was submitted to the jury on strict liability alone, we will address his contention with this theory in mind.

In urging that the trial court erred in permitting this testimony, appellant relies on *Anderson v. Heron Eng. Co., Inc.*, 198 Colo. 391, 604 P.2d 674 (1979). There the Colorado Supreme Court was concerned with the question of whether the fact that a manufacturer had no knowledge of problems with its product or that thousands of similar units had been used without incident was relevant evidence in a strict-liability action. The manufacturer was attempting to show that it had no knowledge of any problems and therefore it had no reason to issue warnings as to the way its product should be utilized. In rejecting the claim, the court held that it made no difference whether the manufacturer had notice of a defect, and to admit such evidence would divert attention away from the product, which is the only focus in a strict-liability action. 604 P.2d at 678–679. We feel that the holding of this case overlooks several things that cause evidence of lack of prior reports or accidents to be relevant to the proof process in a strict-liability case where defective design is alleged.

A plaintiff who is able to show substantially similar circumstances can successfully offer evidence of prior accidents in a products-liability case whether his theory is negligent design or strict liability. *Rucker v. Norfolk & W. Ry. Co.*, 77 Ill.2d 434, 33 Ill.Dec. 145, 396 N.E.2d 534 (1979); *Craven v. Niagara Mach. & Tool Works, Inc.*, Ind. App., 417 N.E.2d 1165 (1981); *Bolm v. Triumph Corp.*, 71 A.D.2d 429, 422 N.Y.S.2d 969 (1979); *Johantgen v. Hobart Mfg. Co.*, 64 A.D.2d 858, 407 N.Y.S.2d 355 (1978); *Eickelberg v. Deere & Company*, Iowa, 276 N.W.2d 442 (1979); *JKT Co., Inc. v. Hardwick*, 274 S.C. 413, 265 S.E.2d 510 (1980); *Magic Chef, Inc. v. Sibley*, Tex., 546 S.W.2d 851 (1977). With this rule in mind, we see no reason why the reverse should not also be true, and several courts have so held.

In *Stark v. Allis-Chalmers and Northwest Roads, Inc.*, 2 Wash.App. 399, 467 P.2d 854 (1970), the court held that evidence of lack of previous accidents is admissible in a products-liability action as long as the product was being used in similar circumstances. The court noted such evidence was relevant to show (1) the nonexistence of an alleged defect; (2) causation purposes, or (3) that the particular situation was not dangerous. 467 P.2d at 858. Similarly, in *Reiger v.*

*Toby Enterprises*, 45 Or.App. 679, 609 P.2d 402 (1980) the court held that evidence of lack of prior accidents with a particular type of meat slicer was admissible to prove the product was not unreasonably dangerous. Also, 1 Hursh & Bailey, American Law of Products Liability § 1:21 (1974) at p. 64 indicates that evidence that other users of certain products were not injured is evidence that the product was not defective, especially where the circumstances surrounding the use were similar.

With these authorities as a backdrop, we are of the opinion that the trial judge ruled properly when he admitted the expert's testimony concerning the lack of prior reported incidents occurring with the type of Yamaha front forks at issue here. Such evidence was relevant to the question of whether or not Craig Caldwell's MX250b motorcycle was defective and whether the alleged defects caused the mishap—facts which were the most crucial issues in the case—facts that were never really proved. In order for such testimony to be properly admitted, the proponent must establish substantive similarity as between the other uses surrounding the incident and those involved in the case at bar. This showing is required whether or not the proponent is the plaintiff or the defendant in any case where a strict products-liability theory is being relied upon. Here, we have no problems with foundation since the appellant's attorney agreed to admission of the evidence as long as the witness was testifying from his personal knowledge. As always, questions of admissibility lie solely within the trial judge's discretion.

We note finally that, with respect to this type of evidence, the parties to the action should urge a cautionary instruction so that the jury, in a strict-liability case, will maintain its focus on the product rather than the manufacturer's knowledge, his conduct or his duty of care.

## OTHER CONTENTIONS

Appellant also contends that the trial court erred in permitting the appellees to present the testimony of a Mr. Wayne Day when that witness had not been listed on the pretrial order. The witness said that he was present at the Decker Coal Mine site when Craig Caldwell was transported there and that at that time he detected a strong odor of alcohol on Mr. Caldwell's breath. We do not believe that the court committed error by allowing the witness to testify.

In *Ford Motor Co. v. Kuhbacher*, Wyo., 518 P.2d 1255 (1974), we were faced with a similar question and we said:

"The listing of the witnesses who would testify at a trial is not only permissible under Rule 16, W.R.C.P., but is desirable and should be encouraged. However, the requirements of adherence to such pretrial orders are within the discretion of the trial court, whose rulings will not be overturned except where there is an abuse of discretion. Courts should generally recognize the binding effect of all matters in the pretrial orders, but this does not mean that there should be rigid or pointless adherence to them in a trial but rather that avoidance of possible hardship to parties and the accomplishment of substantial justice to the merits of claims should be among the factors which the trial court considers. *Washington Hospital Center v. Cheeks*, 129 U.S.App.D.C. 339, 394 F.2d 964, 965–966; *Stewart v. Meyers*, 7 Cir., 353 F.2d 691, 696; 6 Wright & Miller, Federal Practice and Procedure: Civil § 1527, p. 609 (1971)." 518 P.2d at 1260."

These principles are applicable here. Not only was Mr. Day's testimony relevant to the appellee's theory of the case—i.e., that it was negligent driving rather than product defect that caused the mishap—but it also served the purpose of impeaching the eyewitness testimony. In addition, although we support the finality of pretrial orders and *urge* courts to avoid the testimony of surprise witnesses, we do not believe abuse of discretion is present here since (in addition to the reasons just stated) appellant was not only permitted to interview the witness prior to his taking the stand, but was also allowed to call a rebuttal witness who refuted and impeached Mr. Day's testimony.

Appellant's final contention concerns the inadequacy of the warnings accompanying the motorcycle purchased by him. He

claims that the warnings were inadequate as a matter of law and the trial court should have granted him a new trial on this issue. In arguing this point, appellant glosses over the fact that the jury was properly instructed with respect to the need for certain warnings and appellant did not object to the giving of this instruction, nor did he offer his own. Also, appellant did not seek a directed verdict with this issue as a basis for his motion. In our view, the evidence surrounding the adequacy of the warnings concerning the maintenance of sufficient oil in the front forks presented a question for the jury since the appellant had confessed his familiarity with the need to change the front-fork oil on motorcycles. With these things in mind we hold that the appellant has no grounds for complaint—especially in view of the fact that he did not offer his own instructions on the issue of adequate warnings. See: *Langdon v. Baldwin-Lima-Hamilton Corp.*, supra, 494 P.2d at 541.

### CONCLUSION

After reviewing the record and contentions raised by appellant, we are convinced that no errors were committed by the trial judge in this case.

Affirmed.